1  ROBERT W. DICKERSON   (SBN 89367)
     *rdickerson@zuberlaw.com*
2  **ZUBER LAWLER & DEL DUCA LLP**
   777 S. Figueroa Street, 37th Floor
3  Los Angeles, California 90017
   Telephone: (213) 596-5620
4  Facsimile: (213) 596-5621

5  Attorneys for Plaintiff Emily Holton

6

7

8                    **UNITED STATES DISTRICT COURT**

9      **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

| | |
|---|---|
| 11  EMILY HOLTON, an individual, | Case No. |
| 12                    Plaintiff, | COMPLAINT FOR: |
| 13          v. | 1) FRAUD / FRAUD IN THE INDUCEMENT; |
| 14  NETSUITE, INC., a Delaware corporation, and Does 1 to 10, | 2) PROMISSORY FRAUD; 3) NEGLIGENT MISPRESENTATION; 4) BREACH OF CONTRACT |
| 15                    Defendants. | 5) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; |
| 16 | 6) VIOLATION OF BUS. & PROF. CODE § 17200); |
| 17 | DEMAND FOR JURY TRIAL |

18

19

20                    **INTRADISTRICT ASSIGNMENT**

21                               **and**

22                    **NOTICE OF RELATED CASE**

23          Pursuant to Civil Local Rule 3-2(c); Plaintiff states that this case should be assigned to the

24  San Francisco Division of the Northern District of California because this case is closely related to

25  a currently-pending case in that Division before the Honorable Magistrate Judge Laurel Beeler:

26  *Grouse River Outfitters Ltd. v. NetSuite, Inc.*, Case No. 3:16-cv-002954-LB, in that the allegations

27  in this case are very similar to the allegations in the *Grouse River* case.

28

Therefore, Plaintiff requests that this case be assigned to the Honorable Magistrate Judge Laurel Beeler within the San Francisco Division.  Plaintiff will promptly file her Notice of Related Case and Administrative Motion pursuant to Civil L.R. 3-12 and L.R. 7-11.

**INTRODUCTION**

1.      Defendant NetSuite, Inc. ("NetSuite") (an entity now owned by Oracle Corporation) is a cloud computing company that has repeatedly engaged in a pattern and practice of fraudulent business practices by knowingly making false representations in the course of selling its computer software and related services.  *See, e.g.*, *Grouse River Outfitters, Ltd. v. NetSuite, Inc.*, 2016 U.S. Dist. LEXIS 141478, Case No. 16-cv02954-LB (N.D. Cal., Oct. 12, 2016) ("According to Grouse River, the software was not installed on time, costs overran substantially, and the system never became fully capable of performing even the "core" functions described in the contracts. Finding more in this than a breach of contract, Grouse River also alleges that, in advertisements and pre-contract discussions, NetSuite misrepresented the capabilities of its software, its experience in installing such a system, and ultimately its ability to provide a system that could perform as promised."); *Kentwool Co. v. NetSuite, Inc.,* 2015 U.S. Dist. LEXIS 19982, Case No. 14-cv-05264 (N.D. Cal., Feb. 15, 2015) (alleging that NetSuite knew that the software sold "lacked the functionality to perform as represented"); *Gulf Coast Medical Group, LLC v. NetSuite, Inc.,* Case No. 14-cv-02202 (N.D. Cal. 2014); *Citadel Environ. Svcs, Inc. v. Netsuite, Inc. et al.*, Case No. BC3963C2 (Sup. Ct. Cal. Los Angeles, 2008).  As detailed herein, TC Ops, LLC ("TC Ops") is yet another such victim.

2.      NetSuite purports to offer customizable cloud-based computer software that runs the businesses of more than 40,000 companies, organizations and subsidiaries in more than 100 countries, particularly as it relates to their operations, financials and customer relations across wholesale, retail and e-commerce channels.

3.      TC Ops was the operator of a nationwide apparel business that contracted with NetSuite in reliance upon NetSuite's express oral and written representations by which NetSuite assured TC Ops that NetSuite's goods and services had all the functionalities and capabilities necessary to satisfy all of TC Ops' stated applicable business needs.

4.      NetSuite's representations were knowingly false when made, intended to fraudulently induce TC Ops to contract with NetSuite for goods and services that NetSuite knew could not and would not conform to provide the functions and functionalities that NetSuite had promised.

5.      NetSuite's software failed to perform, and was incapable of performing, as NetSuite had promised, causing TC Ops to suffer substantial damage.

6.      In the face of a good-faith payment dispute arising from NetSuite's fraudulent business practices, TC Ops suffered additional damage when NetSuite wrongfully suspended and then wrongfully terminated TC Ops' access to NetSuite's software that was then providing functionalities and/or housing data belonging to TC Ops upon which TC Ops relied for its essential business needs.

7.      Plaintiff Emily Holton ("Plaintiff") (through an intermediary holding company) is an owner of TC Ops and the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all of the following causes of action asserted in this Complaint:  (1) Fraud; (2) Fraud in the Inducement; (3) Promissory Fraud; (4) Negligent Misrepresentation; (5) Breach of Contract; (6) Breach of Covenant of Good Faith and Fair Dealing; (7) Violation of California's Business and Professional Code § 17200.

## **THE PARTIES**

8.      Plaintiff is an individual residing at 229 Chestnut Street, Englewood, New Jersey 07631.

9.      Plaintiff (through an intermediary holding company) is an owner of TC Ops and is the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all causes of action asserted in this Complaint.

10.     NetSuite is a Delaware corporation with its principal place of business at 2955 Campus Drive, Suite 100, San Mateo, California 94403.

11.     Plaintiff is ignorant of the inter- and intra-relationships and inter- and intra-workings of Defendant NetSuite, Inc., and whether there are any other legal entities or individuals in the chain of command and control, or who are otherwise complicit, with respect to

3
COMPLAINT

the wrongful actions hereinafter alleged, and thus may be liable jointly and severally with defendant NetSuite.  Therefore, as their true names or capacities are at this time unknown to Plaintiff, they are sued herein under the fictitious names Does 1 through 10, inclusive.  Plaintiff reserves the right to amend this Complaint as appropriate with respect to such Doe Defendants.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

13.     Venue is proper in this Court and Division under 28 U.S.C. § 1391(b) and Civil Local Rule 3-2.

## FACTS

14.     TC Ops engaged in the design, manufacture, distribution, sale and promotion of apparel products for a group of affiliated apparel companies.  TC Ops sold products through retail channels (including approximately 25 brick and mortar retail stores operating under the name SLAMXHYPE®), wholesale channels and e-commerce.

15.     A critical component of TC Ops' business model was that TC Ops served as a back-end service company for multiple apparel businesses, by which TC Ops was responsible for servicing and administering those businesses' finance, inventory, procurement, order entry, fulfillment, human resources, shipping and billing needs.

16.     NetSuite advertises and represents that it provides customizable cloud-based computer software that runs the businesses of more than 40,000 companies, organizations and subsidiaries in over 100 countries, particularly as relates to their operations, financials and customer relations across wholesale, retail and e-commerce channels.

17.     NetSuite's product offerings include (a) enterprise resource planning ("ERP"), by which NetSuite supports its customers' back office operations including finance, inventory, procurement, order entry, fulfillment, human resources, shipping and billing; (b) customer relationship management ("CRM"), by which NetSuite supports its customers' sales, marketing operations and customer insights; (c) retail point of sale ("POS") software, by which NetSuite

purports to empower its customers with the tools and information they need to operate their brick-and-mortar retail store platforms, specifically to be able to increase efficiencies and provide customers with exceptional service; (d) e-commerce, by which NetSuite offers a platform for online sales and integration with traditional phone and POS tools; and (e) retail management, by which NetSuite offers a cloud-based, multi-channel retail management system that brings together POS and e-commerce with CRM, marketing, merchandising, order management, financials and warehouse management into a single centrally managed solution.

18.     In or about November 2013, TC Ops was searching for a new platform to replace its then-existing ERP, CRM, POS and related systems.  TC Ops was looking for a top-of-the-line system that would service TC Ops' multi-channel operations in the apparel industry on a fully-integrated basis, including as it related to TC Ops' responsibility for the multiple apparel businesses for which TC Ops served as a service provider.

19.     In or about November 2013, TC Ops began discussions with NetSuite to understand if and how NetSuite could service TC Ops' business needs through ERP, CRM, POS and other systems to service TC Ops' multi-channel operations in the apparel industry on a fully-integrated basis.

20.     Those discussions continued through March 12, 2014 and, during the discussions, TC Ops disclosed in detail to NetSuite (a) all of TC Ops' business practices, business processes, business needs and business goals for fully-integrated ERP, CRM, POS and other systems, including for TC Ops' needs as an apparel company operating through wholesale, retail and e-commerce channels, and (b) the functionalities and capabilities that TC Ops would require from NetSuite. TC Ops expressly and repeatedly made clear that it desired and required a system consistent with "best practices" for an apparel company operating through wholesale, retail and e-commerce channels.

21.     Throughout these discussions, NetSuite repeatedly represented, promised and assured TC Ops that (a) NetSuite's product offerings would satisfy all of TC Ops' business practices, business processes, business needs and business goals for fully-integrated ERP, CRM, POS and other systems, including for TC Ops' needs as an apparel company operating through

1     wholesale, retail and e-commerce channels; and (b) NetSuite's products had all the functionalities

2     and capabilities that TC Ops required in these systems if TC Ops were to enter into a contractual

3     arrangement with NetSuite. These representations, promises and assurances were not mere

4     puffery, but are specific representations, promises and assurances about specific aspects,

5     attributes, characteristics and capabilities of NetSuite's products.

6         22.     NetSuite's representatives made these representations, promises and/or assurances

7     repeatedly to TC Ops between November 2013 and March 12, 2014 through in-person

8     communications (including at TC Ops' New York City office), telephonic communications and

9     e-mail communications, specifically by representatives of NetSuite (including Sharon Lobo,

10     David Appel, Russ Reed and Ryan Earley) to representatives of TC Ops (including Jonathan

11     Pearl, Jeff Gregg, Adam Sachs, Shaun Martinez and Mithun Kadur).

12         23.     Of particular importance to TC Ops was the nature and quality of NetSuite's

13     products and services for a POS system for TC Ops' nationwide retail store chain. During the

14     in-person meetings, telephonic communications and e-mail communications, NetSuite (again

15     through its representatives Sharon Lobo, David Appel, Russ Reed and Ryan Earley) represented,

16     promised and assured representatives of TC Ops (including Jonathan Pearl, Jeff Gregg, Adam

17     Sachs, Shaun Martinez and Mithun Kadur) that NetSuite was ready, willing and able to provide

18     TC Ops with a customizable POS module named "Retail Anywhere" that would satisfy all of TC

19     Ops' practices, processes, needs and goals for TC Ops' nationwide retail store chain, and that the

20     retail system would be fully-integrated with NetSuite's ERP, CRM and other system offerings.

21         24.     Due to the critical importance of these systems to TC Ops' business, TC Ops' Chief

22     Executive Officer, Seth Gerszberg, requested an in-person meeting with NetSuite's President of

23     Distribution, Jeff Honeycomb, to confirm that NetSuite's systems in fact would satisfy all of TC

24     Ops' practices, processes, needs and goals as NetSuite's other representatives had represented.

25         25.     As a result of that request, there was an in-person meeting at TC Ops' New York

26     City office, on or about February 25, 2014 beginning at 7:00 p.m. (Eastern Standard Time) where

27     Mr. Gerszberg specifically asked Mr. Honeycomb to confirm that (a) NetSuite fully understood all

28     of TC Ops' practices, processes, needs and goals for fully-integrated ERP, CRM, POS and other

1   systems for TC Ops' multi-channel operations in the apparel industry, and (b) NetSuite's products

2   had all the functionalities and capabilities to meet TC Ops' requirements.

3       26.     Mr. Honeycomb responded by advising Mr. Gerszberg that Mr. Honeycomb then

4   believed that NetSuite's prior representations were completely accurate and that NetSuite could

5   perform as it had promised, but that Mr. Honeycomb wanted to confer with his team to be

6   absolutely certain that this was the case.

7       27.     A few days later, Mr. Honeycomb made phone calls to TC Ops' representatives,

8   Mr. Gerszberg and Mr. Pearl, during which Mr. Honeycomb expressly confirmed that (a) NetSuite

9   fully understood all of TC Ops' practices, processes, needs and goals for fully-integrated ERP,

10  CRM, POS and other systems for TC Ops' multi-channel operations in the apparel industry, and

11  (b) NetSuite could and would provide all such functionalities and capabilities if TC Ops entered

12  into a contractual arrangement with NetSuite.

13      28.     As between NetSuite and TC Ops, NetSuite had superior, sole and exclusive

14  knowledge of its product offerings, including the functionalities and capabilities of its ERP, CRM,

15  POS and other systems, and of NetSuite's ability to customize, configure and implement these

16  systems for TC Ops' requirements.

17      29.     Based upon these express representations, promises and assurances made by

18  representatives of NetSuite to representatives of TC Ops, on or about March 11, 2014, TC Ops

19  entered into written agreements with NetSuite, including (1) a written NetSuite Subscription

20  Services Agreement dated March 12, 2014 (the "Subscription Services Agreement"), pursuant to

21  which TC Ops purchased rights to NetSuite's suite of business applications (including for fully-

22  integrated ERP, CRM, POS and other systems for TC Ops' multi-channel operations); and (2) a

23  Professional Services Statement of Work dated March 11, 2014 (the "Professional Services

24  Agreement"), pursuant to which NetSuite agreed to provide TC Ops with a range of critically

25  important technical and professional services for implementing NetSuite's applications (including

26  project engagement, project preparation, functional configuration, technical design, testing,

27  deployment, training and consulting) to satisfy all of TC Ops' practices, processes, needs and

28

1  goals for fully-integrated ERP, CRM, POS and other systems for TC Ops' multi-channel

2  operations in the apparel industry.

3      30.    Consistent with NetSuite's repeated representations, promises and assurances to TC

4  Ops that NetSuite's product offerings would satisfy all of TC Ops' practices, processes, needs and

5  goals for fully-integrated ERP, CRM, POS and other systems for TC Ops' multi-channel

6  operations, Section 3.1 of the Professional Services Agreement provided that NetSuite would be

7  "Responsible for providing NetSuite resources needed for a successful implementation."

8      31.    To achieve that outcome (i.e., a "successful implementation"), NetSuite's price

9  quote for all services set out in the Professional Services Agreement (by which NetSuite's baseline

10  software platform was to be fully customized for TC Ops) was $324,960.  TC Ops expressly relied

11  on that price quote in making its decision to enter into the Subscription Services Agreement and

12  Professional Services Agreement.

13      32.    NetSuite did not deliver a working system as NetSuite had promised.  The systems

14  NetSuite provided to TC Ops were defective and lacked the most basic, essential functionalities

15  that NetSuite's representatives repeatedly had promised to TC Ops (and that would have been the

16  minimal reasonably acceptable functionalities necessary for any apparel business).

17      33.    In those instances where the promised functionalities purportedly existed, they

18  simply did not work.  By way of example only, NetSuite's system lacked all the following key

19  functionalities (collectively, the "System Defects"):

20          A.    NetSuite's platform lacked an interface and nomenclature suitable for use

21              by an apparel business;

22          B.    NetSuite's platform lacked functionalities necessary to track stock-keeping

23              units ("skus") for an apparel business, including due to an inability to record

24              products of similar style varied in size and/or color;

25          C.    NetSuite's platform lacked the functionalities necessary for successful

26              implementation of automated interconnectivities such as electronic data

27              exchange (EDI) standard for an apparel business;

28          D.    NetSuite's platform was unusable for large volumes of skus;

E.    Retail Anywhere did not work, was constructed without essential flexibility and otherwise was not industry standard, including because it could not process all transactions;

F.    The grid-order entry system did not work, was constructed without essential flexibility and otherwise was not industry standard;

G.    The order entry and order management (editing, allocating) did not work, were constructed without essential flexibility and otherwise were not industry standard;

H.    UPC creation and assignment functionalities did not work, were constructed without essential flexibility and otherwise were not industry standard;

I.    The pre-pack coding did not work, was constructed without essential flexibility and/or otherwise was not industry standard;

J.    The sequencing systems did not work, were constructed without essential flexibility and otherwise were not industry standard;

K.    The system lacked functionalities to track inventory movement across retail, wholesale and e-commerce channels, making it unsuitable for any multi-channel operation such as TC Ops' operation;

L.    The system could not properly integrate with systems provided by TC Ops' standard and reputable third-party providers such as Epicor for retail and/or Magento for e-commerce;

M.    The allocation processes did not work, were constructed without essential flexibility and otherwise were not industry standard;

N.    The ASN (advanced shipping notice) functionality did not work, was constructed without essential flexibility and otherwise was not industry standard;

O.    The systems to value and track inventory cost did not work, were constructed without essential flexibility and otherwise were not industry standard;

P.      The systems to track and move inventory did not work, were constructed without essential flexibility and otherwise were not industry standard;

Q.      The systems did not integrate with a point-of-sale ("POS") reader;

R.      The system's sequencing was incompatible with the needs of an apparel business, including because it would transmit orders to a warehouse out-of-sequence, making it impossible for the warehouse to have up-to-date information at the time of receipt or shipment;

S.      The POS system was not chip compliant and credit card readers would not work;

T.      The interface of the POS system did not work, was constructed without essential flexibility and otherwise was not industry standard;

U.      Large files could not be loaded into the system;

V.      The system was unusable for reporting needs reasonably required by an apparel business;

W.      The system could not run standard reports for 'vertical' viewing, so reports had to be viewed 'horizontally' resulting in exponentially longer reports (often ten times or more longer) than necessary, and completely inconsistent with industry norms;

X.      The system contained non-standard nomenclature causing confusion for users;

Y.      Intercompany accounting processes did not work, were constructed without essential flexibility and otherwise were not industry standard;

Z.      The system could not generate forms and reports required by TC Ops;

AA.    Reports were unusable and often could not be consolidated; and

BB.    The system was unusable due to slow and inconsistent processing speeds, following which the entire system would often 'time out'.

34.     These System Defects rendered the systems provided to TC Ops by NetSuite non-functional, defective and otherwise not in conformance with the repeated, express promises, representations and assurances NetSuite had made to TC Ops.

35.     TC Ops gave NetSuite multiple opportunities to cure the System Defects, but NetSuite was unable to do so.

36.     NetSuite was inherently incapable of correcting a large number of the System Defects because the operating functionalities that NetSuite had promised to TC Ops were incompatible with the core of NetSuite's software platform as constructed and implemented by NetSuite.

37.     NetSuite's staff assigned to remediate the project were unqualified to solve, and incapable of solving, the System Defects.

38.     NetSuite's staff purported to create new coding 'scripts' to solve for the System Defects, but the scripts did not work.  To the contrary, those scripts only made the problems worse, causing the already defective systems provided by NetSuite to TC Ops to "time-out" or crash repeatedly, rendering them unusable.

39.     NetSuite caused material project delays, material cost-overruns and a disastrous implementation which materially prejudiced TC Ops' ability to run its business.

40.     NetSuite's functional gaps and defective design, configuration and programming, including the System Defects, resulted in TC Ops enduring months of inventory, billing, shipping, reporting, sourcing, supply chain and other problems.

41.     TC Ops suffered substantial damages from lost sales directly as a result of (a) NetSuite's failure to deliver the goods and services it promised to TC Ops, (b) NetSuite's provision of goods and service that were non-functional, defective and not in conformance with the promises, representations and assurances that NetSuite had made to TC Ops, and (c) NetSuite's provision of goods and services that were inconsistent with the needs of an apparel company such as TC Ops which operated through wholesale, retail and e-commerce channels.

42.     NetSuite's System Defects materially prejudiced the essence of TC Ops' business model by which TC Ops served as a back-end service company responsible for servicing and

administering finance, inventory, procurement, order entry, fulfillment, human resources, shipping and billing needs for multiple apparel businesses.

43.     Based on the fact that NetSuite's own staff was unable to solve the System Defects with NetSuite's own products, TC Ops was forced to redeploy its own internal staff and retain multiple third-party consultants to try to remediate the defects in NetSuite's products.  This forced TC Ops to use resources and spend money well above the budget for the project to which the parties had agreed.  Even with these costs and effort, neither NetSuite nor TC Ops nor any team of third-party consultants was able to get NetSuite's products to work functionally as NetSuite had promised.

44.     NetSuite wrongfully billed TC Ops for charges for scripting and/or other services allegedly performed by NetSuite under the Professional Services Agreement.  NetSuite billed for these charges without providing TC Ops with reasonable detail sufficient to permit an understanding, review and audit of the bills, making it impossible for TC Ops to review, question and/or challenge the bills in any meaningful way.  In all events, the stated charges could not possibly have been due or owing because the underlying services were not performed properly. Indeed, despite the alleged provision of any such services, NetSuite still had failed to cure the System Defects and/or otherwise deliver in good working order the systems which TC Ops had paid for.

45.     In or about the summer of 2015, TC Ops fairly held back certain payments improperly billed by NetSuite under the Professional Services Agreement, specifically because (a) the bills did not provide TC Ops with sufficient detail to identify the nature of the charges, and (b) the services charged for were not properly performed, resulting in TC Ops having sustained substantial damages from NetSuite's defective systems, coupled with the expenditure of additional sums to third-party consultants to try to solve for functional problems that NetSuite was unable or unwilling to solve.

46.     In or about October 2015, NetSuite, without notice or warning, suspended TC Ops' access to its ERP, CRM, POS and other systems. NetSuite did so to exert leverage and force TC Ops to make the disputed payments to NetSuite.

47.     NetSuite had no contractual or other right to impose this suspension.

48.     As a direct result this suspension, NetSuite knowingly and intentionally caused severe disruption to TC Ops' business, customers and suppliers, causing additional damages. NetSuite subsequently restored TC Ops' service with a wrongful threat to re-suspend services at any later time of NetSuite's choosing.

49.     In December 2015, NetSuite notified TC Ops that NetSuite intended to terminate the Subscription Services Agreement effective at any time without notice, but in all events on or before January 18, 2016.  NetSuite had no contractual or other right to threaten or invoke any such termination of service.

50.     In or about December 2015, NetSuite wrongfully terminated the Subscription Services Agreement.

51.     The System Defects were so severe and egregious that NetSuite and NetSuite's representatives undoubtedly knew that their representations, promises and assurances regarding the functionalities of the systems were false when they made them.

52.     These representations, promises and assurances were fraudulent and made in bad faith to induce TC Ops into entering into contractual relationships with NetSuite under false pretenses.

53.     The representatives of NetSuite who made these knowingly false representations, promises and assurances about the functionalities of the promised system did so because they were incentivized by NetSuite to make sales irrespective of the truth of their claims, including to generate revenues to increase the value of their short-term and long-term compensation and the share price of publicly-traded NetSuite.

54.     It was only within the three-year period immediately preceding the filing of this Complaint that TC Ops (and the Plaintiff) received notice or information of circumstances that put them (and that would have put a reasonable person) on notice of NetSuite's fraudulent representations.

55.     TC Ops paid substantial sums to NetSuite for a non-working system, paid substantial sums more to third-parties in an effort to remediate the system, and suffered substantial

1   losses resulting from NetSuite's fraud, misrepresentations, contractual breaches and/or other forms

2   of wrongdoing.

3       56.     Plaintiff (through an intermediary holding company) is an owner of TC Ops and is

4   the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against

5   NetSuite, including as it relates to all causes of action asserted in this Complaint.

6                            **FIRST CLAIM FOR RELIEF**

7   **(Fraud/Fraudulent Inducement)**

8       57.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth

9   herein.

10      58.     NetSuite made material misrepresentations to TC Ops, including through its false

11  representations, promises and assurances that (a) NetSuite's product offerings would satisfy all of

12  TC Ops' practices, processes, needs and goals for fully-integrated ERP, CRM, POS and other

13  systems for TC Ops' multi-channel operations in the apparel industry, (b) NetSuite's product

14  offerings had all the functionalities and capabilities that TC Ops required in these systems, (c)

15  NetSuite's product offerings would be consistent with best practices for an apparel company

16  operating through wholesale, retail and e-commerce channels, (d) NetSuite was ready, willing and

17  able to provide TC Ops with a customizable POS module named "Retail Anywhere" that would

18  satisfy all of TC Ops' requirements for its operation of a nationwide retail store chain, and in a

19  manner fully-integrated with NetSuite's ERP, CRM and other system offerings, (e) NetSuite

20  would provide all resources needed for a successful implementation, and (f) NetSuite was ready,

21  willing and able to implement the project on time and within budget.

22      59.     NetSuite's promises were false, and NetSuite and its representatives knew them to

23  be false when made.

24      60.     NetSuite's false statements concerned present facts, including as they related to the

25  then-existing promised functionalities and capabilities of NetSuite's product offerings that were

26  likely to deceive TC Ops and were made in bad faith to induce TC Ops to enter into agreements.

27      61.     NetSuite knowingly and intentionally concealed the System Defects.

28

62.     NetSuite made false statements and concealed information in bad faith to fraudulently induce TC Ops to enter into the Subscription Services Agreement and the Professional Services Agreement.

63.     NetSuite had knowledge of the falsity of such representations when they were made.

64.     NetSuite made these false representations with the specific intent to defraud TC Ops, and to induce TC Ops to rely on them in deciding to contract with NetSuite.

65.     As between NetSuite and TC Ops, NetSuite had superior, sole and exclusive knowledge of (a) its product offerings, (b) the functionalities and capabilities of its ERP, CRM, POS and other systems, and (c) NetSuite's stated ability to customize, configure and implement NetSuite's systems for TC Ops' stated desires and requirements.

66.     NetSuite fraudulently induced TC Ops to enter into the Subscription Services Agreement and the Professional Services Agreement.

67.     TC Ops justifiably relied on NetSuite's false representations and only on that basis (a) entered into the Subscription Services Agreement and Professional Services Agreement, and (b) replaced its then-existing legacy systems with the non-working systems provided by NetSuite.

68.     As a direct and proximate result of TC Ops' reliance upon NetSuite's fraudulent representations, TC Ops sustained substantial damages.

69.     Plaintiff is the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all causes of action asserted in this Complaint.

## SECOND CLAIM FOR RELIEF

### (Promissory Fraud)

70.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

71.     NetSuite promised TC Ops that (a) NetSuite's product offerings would satisfy all of TC Ops' stated requirements for fully-integrated ERP, CRM, POS and other systems for TC Ops' multi-channel operations in the apparel industry, (b) NetSuite's product offerings had all the

functionalities and capabilities that TC Ops required for these systems, (c) NetSuite's product offerings would meet and comply with best practices for an apparel company operating through wholesale, retail and e-commerce channels, (d) NetSuite was ready, willing and able to provide TC Ops with a customizable POS module named "Retail Anywhere" that would satisfy all of TC Ops' stated business requirements for operating TC Ops' nationwide retail store chain, (e) the "Retail Anywhere" module would be fully-integrated with NetSuite's ERP, CRM and other system offerings, (f) NetSuite would provide all resources needed for a successful implementation, and (g) NetSuite was ready, willing and able to implement the project on time and within budget.

72.     NetSuite's promises were false, and NetSuite and its representatives knew them to be false when made.

73.     NetSuite's false statements concerned present facts, including as they related to the then-existing functionalities and capabilities of NetSuite's product offerings.  NetSuite knowingly and intentionally concealed the System Defects.

74.     NetSuite made these promises in bad faith to fraudulently induce TC Ops to enter into the Subscription Services Agreement and the Professional Services Agreement.

75.     NetSuite made these promises knowing that it could not perform and without the intention of performing as promised.

76.     TC Ops justifiably relied on NetSuite's false representations and only on that basis (a) entered into the Subscription Services Agreement and Professional Services Agreement, and (b) replaced its then-existing legacy systems with the non-working systems provided by NetSuite.

77.     As a direct and proximate result of TC Ops' reliance upon NetSuite's promises, TC Ops sustained substantial damages.

78.     Plaintiff is the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all causes of action asserted in this Complaint.

**THIRD CLAIM FOR RELIEF**

**(Negligent Misrepresentation)**

79.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

80.     NetSuite made material misrepresentations to TC Ops, including through its false representations, promises and assurances that (a) NetSuite's product offerings would satisfy all of TC Ops' stated requirements for fully-integrated ERP, CRM, POS and other systems for TC Ops' multi-channel operations in the apparel industry, (b) NetSuite's product offerings had all the functionalities and capabilities that TC Ops required for these systems, (c) NetSuite's product offerings would meet and comply with best practices for an apparel company operating through wholesale, retail and e-commerce channels, (d) NetSuite was ready, willing and able to provide TC Ops with a customizable POS module named "Retail Anywhere" that would satisfy all of TC Ops' stated business requirements for operating TC Ops' nationwide retail store chain, (e) the "Retail Anywhere" module would be fully-integrated with NetSuite's ERP, CRM and other system offerings, (f) NetSuite would provide all resources needed for a successful implementation, and (g) NetSuite was ready, willing and able to implement the project on time and within budget.

81.     NetSuite's promises were false, and NetSuite and its representatives knew or should have known them to be false when made.

82.     NetSuite's false statements concerned present facts, including as they related to the then-existing functionalities and capabilities of NetSuite's product offerings.  Without limiting the foregoing, NetSuite failed to disclose the System Defects.

83.     NetSuite was without reasonable grounds for believing its representations to TC Ops to have been true.

84.     NetSuite owed TC Ops a duty to provide TC Ops with accurate information concerning the functionalities and capabilities of NetSuite's products.

85.     NetSuite breached that duty by providing TC Ops with inaccurate information concerning the functionalities and capabilities of NetSuite's products.

86.     TC Ops reasonably relied on NetSuite's false representations when it decided to contract with NetSuite.

87.     TC Ops justifiably relied on NetSuite's false representations and only on that basis (a) entered into the Subscription Services Agreement and Professional Services Agreement, and (b) replaced its then-existing legacy systems with the non-working systems provided by NetSuite.

88.     If NetSuite did not act fraudulently, then it acted negligently.

89.     As a direct and proximate result of TC Ops' reliance upon NetSuite's misrepresentations, TC Ops sustained substantial damages.

90.     Plaintiff is the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all causes of action asserted in this Complaint.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract)

91.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

92.     The Subscription Services Agreement and Professional Services Agreement constituted valid and existing contracts for the purchase, customization, configuration and implementation of NetSuite's ERP, CRM, POS and other systems for TC Ops' specific needs and uses.

93.     TC Ops properly performed under these contracts or had valid excuses for nonperformance based on NetSuite's breaches of the contracts.

94.     NetSuite failed without justification to perform material contractual obligations when performance was due under the Subscription Agreement and Professional Services Agreement, including by (a) providing TC Ops with ERP, CRM, POS and other systems that were defective and non-functional; (b) providing TC Ops with ERP, CRM, POS and other systems that included System Defects; (c) failing to remediate the System Defects; (d) failing to provide resources needed for a successful implementation; (e) overcharging TC Ops for licenses for non-functional systems; (f) overcharging TC Ops for work that was unreasonable, defective,

1  improperly performed or not performed at all; (g) wrongfully suspending TC Ops' access to

2  NetSuite's software that were then providing functionalities and housed data belonging to TC Ops

3  that TC Ops needed to run its business; and (h) wrongfully terminating TC Ops' access to

4  NetSuite's software that was then providing functionalities and housing data belonging to TC Ops

5  that TC Ops needed to operate its business.

6       95.    As a direct and proximate result of NetSuite's breaches of contract, TC Ops

7  sustained substantial damages.

8       96.    Plaintiff is the successor-in-interest to (and owner of) all of TC Ops' rights, claims

9  and remedies against NetSuite, including as it relates to all causes of action asserted in this

10  Complaint.

11  **FIFTH CLAIM FOR RELIEF**

12  **(Breach of Covenant of Good Faith and Fair Dealing)**

13       97.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth

14  herein.

15       98.    The Subscription Services Agreement and Professional Services Agreement

16  constituted valid and existing contracts for the purchase, customization, configuration and

17  implementation of NetSuite's ERP, CRM, POS and other systems for TC Ops' specific needs and

18  uses.

19       99.    TC Ops properly performed under these contracts or had valid excuses for

20  nonperformance based on NetSuite's breaches of the contracts.

21       100.    NetSuite failed without justification to perform material contractual obligations

22  when performance was due under the Subscription Agreement and Professional Services

23  Agreement, including by (a) providing TC Ops with ERP, CRM, POS and other systems that were

24  defective and non-functional; (b) providing TC Ops with ERP, CRM, POS and other systems that

25  included System Defects; (c) failing to remediate the System Defects; (d) failing to provide

26  resources needed for a successful implementation; (e) overcharging TC Ops for licenses for non-

27  functional systems; (f) overcharging TC Ops for work that was unreasonable, defective,

28  improperly performed or not performed at all; (g) wrongfully suspending TC Ops' access to

NetSuite's software that were then providing functionalities and housed data belonging to TC Ops that TC Ops needed to run its business; and (h) wrongfully terminating TC Ops' access to NetSuite's software that was then providing functionalities and housing data belonging to TC Ops that TC Ops needed to operate its business.

101.    NetSuite acted in bad faith to frustrate the contracts' benefits, breaching the covenant of good faith and fair dealing inherent in the relationship between TC Ops and NetSuite.

102.    As a direct and proximate result of NetSuite's breaches of the covenant of good faith and fair dealing, TC Ops sustained substantial damages.

103.    Plaintiff is the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all causes of action asserted in this Complaint.

<u>**SIXTH CLAIM FOR RELIEF**</u>

<u>**(Violation of Business and Professions Code § 17200 et seq.)**</u>

104.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

105.    NetSuite made material misrepresentations to TC Ops, including through its false representations, promises and assurances that (a) NetSuite's product offerings would satisfy all of TC Ops' stated requirements for fully-integrated ERP, CRM, POS and other systems for TC Ops' multi-channel operations in the apparel industry, (b) NetSuite's product offerings had all the functionalities and capabilities that TC Ops required for these systems, (c) NetSuite's product offerings would meet and comply with best practices for an apparel company operating through wholesale, retail and e-commerce channels, (d) NetSuite was ready, willing and able to provide TC Ops with a customizable POS module named "Retail Anywhere" that would satisfy all of TC Ops' stated business requirements for operating TC Ops' nationwide retail store chain, (e) the "Retail Anywhere" module would be fully-integrated with NetSuite's ERP, CRM and other system offerings, (f) NetSuite would provide all resources needed for a successful implementation, and (g) NetSuite was ready, willing and able to implement the project on time and within budget.

106.    NetSuite's false statements concerned present facts (including as they related to the then-existing promised functionalities and capabilities of NetSuite's product offerings) that were likely to deceive TC Ops and were made in bad faith to induce TC Ops to enter into agreements.

107.    NetSuite had knowledge of the falsity of these representations when they were made.

108.    NetSuite made these false representations with the specific bad faith intention to defraud TC Ops, and to induce TC Ops to rely on these false representations in TC Ops' decision to contract with NetSuite.

109.    As between NetSuite and TC Ops, NetSuite had superior, sole and exclusive knowledge of its product offerings and of the functionalities and capabilities of its ERP, CRM, POS and other systems, and of NetSuite's ability to customize, configure and implement these systems for TC Ops' specific needs and uses.

110.    NetSuite's misrepresentations violated duties of disclosure owed to TC Ops.

111.    NetSuite fraudulently induced TC Ops to enter into the Subscription Services Agreement and the Professional Services Agreement.

112.    TC Ops justifiably relied on NetSuite's false representations and only on that basis (a) entered into the Subscription Services Agreement and Professional Services Agreement, and (b) replaced its then-existing legacy systems with the non-working systems provided by NetSuite.

113.    TC Ops suffered injury in fact and lost money or property as a result of NetSuite's unlawful, unfair or fraudulent business acts.

114.    As a direct and proximate result of TC Ops' reliance upon NetSuite's fraudulent representations, TC Ops sustained substantial damages.

115.    NetSuite's conduct constituted an unlawful, unfair or fraudulent business act within the meaning of Business and Professions Code § 17200 et seq.

116.    Plaintiff is the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all causes of action asserted in this Complaint.

**PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES**

117.    By its conduct set forth above, NetSuite perpetrated "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving [TC Ops] of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

118.    NetSuite's conduct was and is oppressive and outrageous.

119.    Plaintiff is the successor-in-interest to (and owner of) all of TC Ops' rights, claims and remedies against NetSuite, including as it relates to all causes of action asserted in this Complaint.

120.    Plaintiff is entitled to punitive damages. Cal. Civ. Code § 3294(a).

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays that this Court:

1.    award Plaintiff compensatory damages in excess of $75,000.00, and according to proof, believed to be at least $5,000,000;

2.    award Plaintiff punitive damages;

3.    award Plaintiff pre- and post-judgment interest;

4.    award Plaintiff its costs and attorney's fees; and

5.    grant Plaintiff such other relief as may be just and proper.


Dated:  November 22, 2017                **ZUBER LAWLER & DEL DUCA LLP**
                                         ROBERT W. DICKERSON


                                         BY:    _/s/ Robert W. Dickerson_____

                                         Attorneys for Plaintiff Emily Holton

1

## **JURY DEMAND**

2

Plaintiff Emily Holton demands a jury trial as to all issues triable to a jury.

3

4    Dated:  November 22, 2017          **ZUBER LAWLER & DEL DUCA LLP**
                                        ROBERT W. DICKERSON

5

6

7                                       BY:    */s/ Robert W. Dickerson*

                                        Attorneys for Plaintiff Emily Holton

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT